UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JESSIE LEE JETMORE STODDARD-NUNEZ,

        Plaintiff,

   v.

CITY OF HAYWARD, et al.,

        Defendants.

Case No.  13-cv-04490-KAW

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 100

     On September 27, 2013, Plaintiff Jessie Lee Jetmore Stoddard-Nunez filed the instant suit against Defendants City of Hayward and Manuel Troche.  (Compl., Dkt. No. 1.)  Plaintiff brings claims under 42 U.S.C. § 1983 and other state law actions, based on the March 3, 2013 shooting death of Plaintiff's brother, Shawn Joseph Jetmore Stoddard-Nunez ("Decedent") by Defendant Troche.  (Third Amended Compl. ("TAC") ¶ 1, Dkt. No. 134.)

     On July 11, 2017, Defendants filed the instant motion for summary judgment.  (Defs.' Mot., Dkt. No. 100.)  Upon consideration of the parties' filings and the arguments made at the September 7, 2017 and April 19, 2018 hearings, and for the reasons set forth below, Defendants' motion for summary judgment is GRANTED.

## I.    BACKGROUND

### A.    Factual Background

     On March 3, 2013, Plaintiff and Decedent had a social gathering at their apartment.  (Brick Decl., Exh. 4 ("Plf.'s Dep.") at 56:22-23, Dkt. No. 102.)  Decedent's friend, Arthur Pakman, attended the gathering.  (Plf.'s Dep. at 57:7-8.)  Decedent and Pakman were drinking alcohol, and Pakman became more violent and disruptive as the night went on.  (Plf.'s Dep. at 62:6-8; 66:14-16.)  Pakman picked a fight with Plaintiff, causing Decedent to intervene.  (Plf.'s Dep. at 67:10-12;

68:10-12.)  When Pakman failed to stop, Plaintiff and Pakman got into an argument, and Plaintiff

asked Pakman to leave.  (Plf.'s Dep. at 69:23-70:5.)  Pakman and Decedent then left.  (Plf.'s Dep.

at 71:7-10.)

That same night, Defendant Manuel Troche was on patrol in full uniform, using a fully

marked patrol vehicle.  (Pointer Decl., Exh. A ("Troche Prelim. Hearing Test.") at 43:11-14, Dkt.

No. 112; Pointer Decl., Exh. A ("McLeod Prelim. Hearing Test.") at 15:3-6.)  Defendant Troche

had a ride-along passenger, Russell McLeod.  (Troche Prelim. Hearing Test. at 44:5-8.)  The

Hayward Police Department Ride-Along Policy requires that a ride-along passenger complete an

application form and execute a waiver of liability; Defendant Troche could not recall whether Mr.

McLeod completed his paperwork.  (Pointer Decl., Exh. D ("Ride-Along Policy"); Exh. B ("Plf.'s

Troche Dep.") at 32:2.)

Around 3:20 a.m., Defendant Troche and Mr. McLeod were on patrol when they noticed a

red Honda Civic swerving over the lane lines.  (Brick Decl., Exh. 5 ("Defs.' Troche Dep.") at

36:25-37:12; Troche Prelim. Hearing Test. at 46:3-4.)  The vehicle was driven by Pakman, with

Decedent in the passenger seat.  At the time, the streets were fairly empty.  (Troche Prelim.

Hearing Test. at 46:1-2.)  Defendant Troche and Mr. McLeod saw the Honda Civic run a red light,

and Defendant Troche followed, trying to catch up because he believed the vehicle could be a

danger to people around it or that the driver was drunk, and decided to investigate.  (Defs.' Troche

Dep. at 38:5-14.)  As Defendant Troche sped up, he did not turn on his traffic enforcement lights,

nor did he radio dispatch to inform them of what he was doing.  (Defs.' Troche Dep. at 38:19-25.)

During the pursuit, Defendant Troche observed the car swerving in and out of the lanes, looking

like he was trying to find somewhere to pull in.  (Plf.'s Troche Dep. at 44:21-45:2.)  He also saw

Pakman go through a stop sign.  (Plf.'s Troche Dep. at 46:11-16.)  Defendant Troche still did not

call the car in or communicate with dispatch regarding an intent to stop the car, as he did not have

license plate information to provide at that juncture.  (Plf.'s Troche Dep. at 46:23-47:3.)

Defendant Troche never activated his sirens.  (Plf.'s Troche Dep. at 48:4-10.)

Defendant Troche caught up to Pakman's vehicle as it pulled around a cul-de-sac on

Fletcher Avenue.  (Defs.' Troche Dep. at 47:16-18.)  As Defendant Troche drove down the cul-de-

2

sac, Pakman reached the end of the cul-de-sac and was looping back, resulting in Defendant Troche and Pakman passing each other. (Defs.' Troche Dep. at 47:14-22.) As they passed, Mr. McLeod was able to make eye contact with the driver and passenger, who were looking at him and Defendant Troche. (McLeod Prelim. Hearing Test. at 8:14-18, 8:27-9:1.) Defendant Troche also looked into the car and saw two men, although neither appeared to make eye contact with him and Defendant Troche did not say anything. (Troche Prelim. Hearing Test. at 50:21-51:25.)

Defendant Troche exited the cul-de-sac, and saw Pakman pull into an empty parking lot of a closed business adjacent to the cul-de-sac, and park in a spot facing the business. (Troche Prelim. Hearing Test. at 51:27-52:2, 52:7-10; Defs.' Troche Dep. at 50:1-8, 54:24-55:3.) Thus, Pakman's vehicle was facing the left-hand side of the parking lot. (McLeod Prelim. Hearing Test. at 9:22-23.) Looking into the parking lot from Fletcher Lane, there was an apartment complex to the right of the parking lot, and a one-level brick building to the left. (Defs.' Troche Dep. at 55:5-15.) There were also two reddish-colored poles at the end of the driveway. (Defs.' Troche Dep. at 55:19-21.) Defendant Troche pulled into the parking lot to the left side of the entrance, near the pole, with part of his vehicle in the roadway, blocking the sidewalk. (Defs.' Troche Dep. at 56:16-57:3; Troche Prelim. Hearing Test. at 52:28-53:1.) Based on this positioning, Defendant Troche's vehicle would have been perpendicular with Pakman's vehicle. Defendant Troche thought that from the way Pakman pulled into a secured lot, it appeared to be a possible ambush situation. (Defs.' Troche Dep. at 61:7-16; Troche Prelim. Hearing Test. at 53:2-7.)

Defendant Troche radioed dispatch a code 1154 (suspicious vehicle). (Defs.' Troche Dep. at 60:10-16; *see also* Brick Decl., Exh. 9 at 2:2-3.) Defendant Troche and Mr. McLeod both exited the marked police vehicle. (McLeod Prelim. Hearing Test. at 10:1-5; Troche Prelim. Hearing Test. at 54:17; Defs.' Troche Dep. at 63:5-7.) Mr. McLeod testified that he got out to get clear of the car, but that before he could go off to the side, Defendant Troche told him not to. (McLeod Prelim. Hearing Test. at 10:19-24.) Mr. McLeod remained next to the patrol car behind the vehicle door. (Defs.' Troche Dep. at 73:10-13.) Defendant Troche testified that he did not remember what, if any, directions he gave to Mr. McLeod as they were exiting or after exiting the vehicle. (Defs.' Troche Dep. at 67:19-22.) Defendant Troche turned on the driver's side overhead

spotlight and set it on the Honda.  (McLeod Prelim. Hearing Test. at 14:11-16; Troche Prelim. Hearing Test. at 54:21-28; Defs.' Troche Dep. at 58:1-59:2.)

Defendant Troche testified that when he exited the vehicle, he immediately drew his gun as he announced himself as "Police," and told the driver, "Shut off the car.  Let me see your hands." (Defs.' Troche Dep. at 63:16-18; 82:8-11; Troche Prelim. Hearing Test. at 55:11-14, 55:24-26, 56:13-22.)  Pakman's window was down, but Pakman did not look at him or respond, and instead continued to look forward.  (Defs.' Troche Dep. at 64:1-10, 66:11-17; Troche Prelim. Hearing Test. at 56:5-7, 57:25-28.)  Defendant Troche saw Decedent leaning over as if reaching for something under the seat or dash, making Defendant Troche believe that he was arming himself or hiding contraband.  (Defs.' Troche Dep. at 69:20-70:1; Troche Prelim. Hearing Test. at 58:1-6.) Defendant Troche continued to give orders to Pakman, telling him to turn the car off and show his hands.  (Defs.' Troche Dep. at 73:19-74:6.)  Pakman and Decedent did not comply with the commands; Defendant Troche then went around the back of his patrol vehicle, walking west to try to get to the back of Pakman's vehicle to get a plate to dispatch.  (Defs.' Troche Dep. at 77:13-19; Troche Prelim. Hearing Test. at 58:22-26.)  At some point, although it was not clear if it was before or while Defendant Troche was moving, Pakman placed a cigarette in his mouth and lit it while continuing to look forward.  (Defs.' Troche Dep. at 74:20, 83:17-21; Troche Prelim. Hearing Test. at 58:17-21.)  When he could not get a good angle for the plate, Defendant Troche returned to the patrol car, positioning himself on the passenger side with Mr. McLeod.  (Defs.' Troche Dep. at 77:20-22; Troche Prelim. hearing Test. at 60:24-27.)  Defendant Troche saw Pakman look at him for the first time with an angry grimace.  (Defs.' Troche Dep. at 86:11-18; Troche Prelim. Hearing Test. at 60:19-21.)

Mr. McLeod testified that he heard Defendant Troche yelling at Pakman and Decedent to "Turn the fucking car off. Turn the fucking car off now. Turn the car off," and to "Get out of the car."  (McLeod Prelim. Hearing Test. at 10:24-11:6.)  Mr. McLeod described Defendant Troche's tone as "[a]uthoritative and yelling."  (McLeod Prelim. Hearing Test. at 11:7-9.)  He did not, however, recall whether Defendant Troche identified who he was.  (McLeod Prelim. Hearing Test. at 11:10-11.)  Mr. McLeod could only see the driver, who never acknowledged Defendant Troche

4

or Mr. McLeod, but continuously looked straight ahead, even though the driver's window appeared to be halfway down. (McLeod Prelim. Hearing Test. at 12:1-15.) Mr. McLeod saw Pakman light a cigarette, although Defendant Troche was still yelling commands. (McLeod Prelim. Hearing Test. at 12:21-26.)

Pakman then put the Honda into reverse, backing up. (Defs.' Troche Dep. at 85:15-17; McLeod Prelim. Hearing Test. at 13:23-26.) Both Mr. McLeod and Defendant Troche testified that they could hear the sound of the car going in reverse. (Defs.' Troche Dep. at 85:20-23; McLeod Prelim. Hearing Test. at 13:27-14:3.) Pakman essentially did a three-point turn in reverse, such that the back-end of his vehicle was against the fence and the headlights were facing Defendant Troche and Mr. McLeod. (Defs.' Troche Dep. at 86:2-10; McLeod Prelim. Hearing Test. at 14:4-7.) During this time, Defendant Troche does not recall giving any instructions to Mr. McLeod. (Plf.'s Troche Dep. at 90:12-17.) The Honda's headlights were on, making it difficult for Defendant Troche to see what was happening inside of the car. (Plf.'s Troche Dep. at 88:20-86:4.) Defendant Troche radioed that the Honda was coming at them based on Pakman's vehicle facing them. (Plf.'s Troche Dep. at 89:23-90:6.) Mr. McLeod recalled Defendant Troche yelling at Pakman, "Don't do it. Don't do it. Turn the car off. Don't do it." (McLeod Prelim. Hearing Test. at 15:9-11; *see also* Troche Prelim. Hearing Test. at 61:10-17.)

Pakman then stepped on the gas and accelerated towards Defendant Troche and Mr. McLeod. (McLeod Prelim. Hearing Test. at 15:10-11; Plf.'s Troche Dep. at 89:24-25; Troche Prelim. Hearing Test. at 61:4.) Defendant Troche could hear the tires screeching or squealing, and believed Pakman floored the gas based on the body shift and the lights going up. (Plf.'s Troche Dep. at 91:16-20.) Mr. McLeod testified that he knew that Pakman was coming his way because the bigger side to get out of the driveway was on his side, and that there was no room to get out from the patrol vehicle driver's side. (McLeod Prelim. Hearing Test. at 15:9-18.) As the Honda came towards the police vehicle, Defendant Troche was standing in the circle near the door, and brought his gun up and pointed at the driver. (Plf.'s Troche Dep. at 92:12-22.) Defendant Troche stated that the car was initially coming forward, but then veered towards the police vehicle's passenger side. (Plf.'s Troche Dep. at 93:7-10; Troche Prelim. Hearing Test. at 62:12-22, 63:6-

13.) Based on the video, Sergeant Eric Krimm, who supervised the investigation into the shooting, stated that he did not recall seeing a discernible swerve, although the quality of the video made it difficult to determine whether the vehicle swerved. (Pointer Decl., Exh. E ("Plf.'s Krimm Dep.") at 18:17-21; 21:11-16.) Crime scene tech Sergeant Jason Corsolini testified that Mr. Pakman's vehicle was on a direct course, *i.e.* going straight towards, with the passenger side of the police vehicle. (Pointer Decl., Exh. H ("Corsolini Dep.") at 87:5-14.)

The vehicle was approximately ten feet from Defendant Troche when he started backpedaling as he opened fire, while also trying to shove Mr. McLeod out of the way of the Honda. (Plf.'s Troche Dep. at 94:15-22, 99:10-11; Troche Prelim. Hearing Test. at 61:19-23, 63:18-20, 63:24-27.) Defendant Troche thought that Mr. McLeod had gotten run over at some point. (Plf.'s Troche Dep. at 95:23-96:2; Troche Prelim. Hearing Test. at 64:17-20.) When Mr. McLeod saw the Honda coming towards him, he ducked down and heard the Honda make contact with the door of the patrol vehicle; the patrol vehicle door then pressed against Mr. McLeod until the car passed and the door opened back up. (McLeod Prelim. Hearing Test. at 16:4-7; *see also* Pointer Dec., Exh. C ("McLeod Interview") at 71:12-25.) Mr. McLeod could hear metal scraping against metal, and felt impact on his left and right side. (McLeod Prelim. Hearing Test. at 16:10-15.) Sergeant Corsolini later found an 18- to 20-inch horizontal line on the body line of the patrol vehicle, in addition to other scuff marks and dents that he believed were made by Mr. Pakman's car. (Brick Decl. ISO Reply, Exh. 21 ("Reply Corsolini Dep.") at 74:1-14.) Sergeant Corsolini did not match the scuff marks to the Honda, and no paint chips from the Honda were found on the patrol vehicle, although white colored paint was found on the Honda. (Plf.'s Corsolini Dep. at 56:3-5; Reply Corsolini Dep. at 72:17-19, 74:15-75:2.)

Defendant Troche was continuously pulling the trigger as quickly as he could. (Plf.'s Troche Dep. at 111:18-19; Troche Prelim. Hearing Test. at 64:14-16.) Defendant Troche ultimately fired nine shots out of thirteen rounds in his gun. (Defs.' Troche Dep. at 24:20-24; Brick Decl., Exh. 14 ("Defs.' Padavana Dep.") at 17:1-4.) Mr. McLeod recalled hearing shots being fired as he felt the patrol vehicle door being pressed up against him, presumably by the Honda as it drove by. (McLeod Prelim. Hearing Test. at 17:4-6; McLeod Interview at 33:22-24.)

When Defendant Troche perceived that the Honda was past him, he stopped firing, by which point he had backed up to the rear of his police vehicle and was in the street. (Plf.'s Troche Dep. at 100:3-13.) Mr. McLeod stated that he looked out of the back window, and saw Pakman's vehicle going down the street and Defendant Troche following, although Defendant Troche was not shooting at that point. (McLeod Interview at 33:17-22.) After the car had gone by, Mr. McLeod thought he heard Defendant Troche say, "I think I got him." (McLeod Prelim. Hearing Test. at 17:21-22.) Defendant Troche then informed the dispatcher: "Shots fired. Shots fired. The vehicle took off." (Brick Decl., Exh. 9 at 2:19-20.) Approximately twelve seconds passed between Defendant Troche radioing dispatch about Pakman's car pointed at them and his informing dispatch that a shooting had occurred. (Brick Decl., Exh. 8 at 0:57-1:08.)

Crime scene tech Sergeant Corsolini found gouge marks near the shooting scene, and concluded that it was caused by Mr. Pakman's Honda exiting the apron. (Corsolini Dep. at 52:15-53:10.) Sergeant Corsolini's conclusion was based on asphalt north of the gouge marks that appeared to be fresh, although Sergeant Corsolini did not analyze whether the asphalt came from the gouge marks. (Corsolini Dep. at 53:14-54:1.) Pakman drove the vehicle until it was involved in a collision. (Brick Decl., Exh. 16 ("Defs.' Krimm Dep.") at 12:23-13:3.)

Bullet holes were found in the Honda's front windshield and hood, front passenger door, and rear passenger door. (Pointer Dec., Exh. F ("Plf.'s Padavana Dep.") at 26:14-16, 29:1-13, 31:7-11.) No bullet holes were found in the back of the vehicle. Bullet fragments were found in the front driver's floorboard, the front passenger floorboard, the rear passenger's door. (Pointer Dec., Exh. I ("Portillo Dep.") at 23:5-7, 26:17-18, 30:11-13.) Decedent suffered two bullet wounds: a gunshot wound to the right shoulder, with the bullet recovered on the left side of the neck, and a through-and-through gunshot wound to the right arm. (Pointer Dec., Exh. J ("Autopsy Report").) Decedent ultimately died from a "massive hemorrhage due to transection of the carotid artery due to gunshot wound to the right arm with neck involvement." (Id.)

When Pakman was interviewed after the incident, he stated that he did not know it was the police and that he was just "trying to get the fuck out of there" because he was getting shot at. (Pointer Decl., Exh. K.) He also denied driving at anyone. (Id.) Pakman was later charged with

7

Decedent's murder, two counts of felony assault, and two counts of driving under the influence. (Brick Decl., Exh. 17.) On January 26, 2016, Pakman pled no contest to involuntary manslaughter and felony driving under the influence. (Brick Decl., Exh. 12 at 1:10-14, 6:17-22.)

### B. Procedural Background

On September 27, 2013, Plaintiff brought claims for § 1983 violations and various state claims, based on Decedent's death. (Compl. at 6-11.) On July 11, 2017, Defendants filed a motion for summary judgment. Defendants argued that Plaintiff lacked standing to bring the instant case because Decedent's father, Jeffrey Stoddard, had superior rights to Plaintiff. (Defs.' Mot. at 6-8.) In the alternative, Defendants argued that Defendant Troche's use of force was reasonable and that he was entitled to qualified immunity. (*Id.* at 9-21.) Defendants also argued that Plaintiff could not establish *Monell* liability as to the claims against the City. (*Id.* at 21-25.)

On August 1, 2017, Plaintiff filed his opposition to Defendants' motion for summary judgment. (Plf.'s Opp'n, Dkt. No. 114.) The opposition included an expert report by Scott G. Roder, which opined that Defendant Troche fired his gun at Pakman's vehicle from behind, and that Decedent died from a gunshot fired from behind Pakman's vehicle as it was driving away. (Roder Decl. ¶¶ 10, 14, Dkt. No. 115.) On August 15, 2017, Defendants filed their reply brief. (Defs.' Reply, Dkt. No. 123.)

On September 7, 2017, the Court held a hearing on Defendants' motion for summary judgment, focused on the standing issue. (*See* Dkt. No. 127.) The parties disputed whether amending the complaint to add Decedent's Estate as a plaintiff would be futile, as Defendants argued that such a complaint would not relate back.

On October 18, 2017, the Court stayed the case to allow the probate court to decide Plaintiff's petition to be appointed as personal representative of Decedent's Estate. (Dkt. No. 131 at 2.) On November 27, 2017, Plaintiff filed a notice that the appointment had been made. (Dkt. No. 132.) On March 1, 2018, the Court unstayed the case and permitted Plaintiff to file a third amended complaint naming Plaintiff as the personal representative of Decedent's Estate, thus resolving the standing issue. (Dkt. No. 133 at 11.)

On March 9, 2018, Plaintiff, acting in his capacity as the personal representative of

Decedent's Estate, filed the operative complaint. Plaintiff brought the following causes of action: (1) 42 U.S.C. § 1983 claim for violation of Decedent's Fourth Amendment Rights; (2) 42 U.S.C. § 1983 claim for wrongful death; (3) *Monell* liability; (4) wrongful death based on negligence; (5) assault; and (6) battery. (TAC at 6-11.)

The Court then set Defendants' motion for summary judgment for hearing and requested that the parties be prepared to address certain issues, including whether Mr. Roder's opinion complied with the requirements of *Daubert* and Federal Rule of Evidence 702. (Dkt. No. 136 at 1-2.)

## II. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when, after adequate discovery, there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law. *Id.*; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id*.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Southern Calif. Gas. Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may discharge its burden of production by either (1) "produc[ing] evidence negating an essential element of the nonmoving party's case" or (2) after suitable discovery, "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to discharge its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd., v.*

*Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000); *see also Celotex*, 477 U.S. at 324-25.

Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 250. "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001). "Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial." *Id.* (citations and quotations omitted). The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NMS Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Electronics Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson,* 477 U.S. at 255; *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir. 2011).

## III.    DISCUSSION

### A.    Seizure

First, Defendants argue that Decedent was not seized as a matter of law, relying on *Nakagawa v. County of Maui*, 686 Fed. Appx. 388 (9th Cir. 2017). (Defs.' Mot. at 8-9.) Generally, "[a] person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer by means of physical force or show of authority terminates or restrains his freedom of movement through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotations and citations omitted). In *Nakagawa*, an unpublished decision,[1] the Ninth Circuit found that there was no intentional seizure of the decedent where the plaintiffs admitted as "undisputed" that each of the officers was aiming

---

[1] Unpublished decisions are not binding authority. (Ninth Cir. Rule 36-3.)

at the driver, but had instead hit a passenger.  686 Fed. Appx. at 389.

The facts of *Nakagawa* are readily distinguishable.  Although not discussed by the Ninth Circuit, the district court, in granting summary judgment, found that "the officers were not aware of [the p]laintiffs' presence in the bed of the truck before they discharged their firearms."  Case Nos. 11-cv-130 DKW-BMK, 12-569 DKW-BMK, 2014 WL 1213558, at *6 (D. Haw. Mar. 21, 2014).  As the officers did not even know that the plaintiffs were in the vehicle, the officers could not have intentionally aimed at the plaintiffs.  *Id.* at *7.  In contrast, Defendant Troche was aware of Decedent's presence prior to the shooting.  (Plf.'s Troche Dep. at 69:21-70:18.)  There is also testimony that Defendant Troche was aiming at the car to stop the driver, which is distinct from shooting only at the driver.  (*See* Plf.'s Troche Dep. at 94:15-16 ("Shots were fired **at the car** to stop the driver from continuing and running us over") (emphasis added).)  The Court, therefore, cannot conclude, as a matter of law, that Decedent was not seized within the meaning of the Fourth Amendment.

### B.    Reasonable Force

Second, the parties dispute whether the amount of force used by Defendant Troche was reasonable.  "Apprehension by deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement."  *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010).  While an officer may not use deadly force to apprehend a suspect that poses no immediate threat to the officer or others, "it is not constitutionally unreasonable to prevent escape using deadly force where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."  *Id.* (internal quotation omitted).  Determining reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  Furthermore, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.*  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make

split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Id.*

### i. Firing at Vehicle that had Passed

In his papers, Plaintiff argues that "the fatal shots were fired after the vehicle had passed Defendant Troche and his patrol vehicle." (Plf.'s Opp'n at 27.) Thus, "at the time the fatal shots were fired, any alleged threat had subsided and the subject vehicle and its occupants did not pose a threat." (*Id.*) The Court finds, however, that Plaintiff has failed to provide any admissible evidence to support this theory. In his opposition, Plaintiff appears to primarily rely on Mr. Roder's expert opinion that shots were fired at the back of the vehicle and that the fatal shot was fired from behind the Honda as it was driving away. (*Id.* at 17-18; Roder Decl. ¶¶ 10, 14.) Mr. Roder's opinion, however, fails to satisfy Rule 702 and *Daubert*. In general, "[t]he trial court must assure that the expert testimony both rests on a reliable foundation and is relevant to the task at hand. Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 813 (9th Cir. 2014).

Here, Mr. Roder's opinion satisfies neither of these requirements. In the order setting this matter for oral argument, the Court explained that "there [wa]s no information on whether 'the testimony is the product of reliable principles and methods,' and whether Mr. Roder 'has reliably applied the relevant principles and methods to the facts of the case.'" (Dkt. No. 136 at 1-2 (quoting *Pyramid Techs., Inc.*, 752 F.3d at 813).) The Court also noted that Mr. Roder's report failed to account for Mr. McLeod's presence and the patrol vehicle doors being open. (*Id.* at 2.) At the hearing, Plaintiff stated that Mr. Roder had been admitted and qualified in other cases, and that Mr. Roder's opinion involved a computer program that had been used for his opinions admitted as expert testimony in other cases. Plaintiff, however, did not explain the methodology used by Mr. Roder, nor did Plaintiff explain how Mr. Roder's opinion had been reliably applied to the facts of the case at bar. Indeed, at the hearing, Plaintiff appeared to concede the issue by asserting that Mr. Roder's opinion was not necessary and requesting that the Court instead rely on

12

the evidence in the record.

That evidence, in turn, is also insufficient to create a dispute of material fact. At the hearing, Plaintiff pointed only to a photograph by CSI Jennifer Padavana of a bullet hole in the back passenger seat, and to the alleged conflicts in the testimony of Defendant Troche and Mr. McLeod. (*See* Dkt. No. 116; Plf.'s Troche Dep. at 89:24-90:6, 95:6-12, 96:24-97:6; McLeod Interview at 33:5-25.) With respect to the photograph, absent an expert report, there is no information as to what conclusions a jury could draw from it. The photograph, alone, does not demonstrate that Defendant Troche fired after the car had already passed him, and without expert testimony to explain the significance of the photograph, a reasonable inference cannot be made as to when Defendant Troche fired his gun.

As to the alleged conflicts in the testimony of Defendant Troche and Mr. McLeod, the Court finds that the conflicts, if any, do not create a dispute in material fact as to whether Defendant Troche shot at the vehicle after it had passed. As a general matter, "once the movant for summary judgment has supported his or her motion, the opponent must affirmatively show that a material issue of fact remains in dispute and may not simply rest on the hope of discrediting movant's evidence at trial." *Frederick S. Wyle Prof'l Corp. v. Texaco, Inc.*, 764 F.2d 604, 608 (9th Cir. 1985). Thus, "[n]either a desire to cross-examine affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment, unless other evidence about an affiant's credibility raises a genuine issue of material fact." *Id.*

Here, Plaintiff argues that Defendant Troche lacks credibility for several reasons. First, Plaintiff contends that Defendant Troche testified that it took two seconds from the time he saw the car moving towards him until he was done shooting, but that it was impossible for the described of events to occur in two seconds. It is undisputed, however, that twelve seconds passed from the time Defendant Troche reported that Pakman was driving towards him to the time he reported that shots had been fired. (Brick Decl., Exh. 8 at 0:57-1:08.) Plaintiff does not argue that based on this twelve seconds, Defendant Troche's testimony that the car was driving at him was false, or that Defendant Troche was shooting at the car after it passed. In other words, whether the events occurred in two seconds or twelve seconds, the dispute is not material because it does not

13

affect Defendant Troche's justification for shooting, which was that the car was driving at him.

Plaintiff also points to Mr. McLeod's testimony that he was in the car when he heard the shots. (*See* McLeod Interview at 33:5-25.) Mr. McLeod testified that Pakman's vehicle clipped the patrol vehicle door, which slammed into Mr. McLeod and caused him to fall onto the passenger seat, when he heard gunfire. (*Id.* at 33:5-12.) When the shooting stopped, he looked up and saw Defendant Troche following Pakman's vehicle as it drove down the street, with Defendant Troche following it but not shooting. (*Id.* at 33:17-25.) Based on this, Plaintiff argues that a jury could infer that Defendant Troche did, in fact, shoot at the back of the vehicle. This inference is, however, unreasonable. In the absence of expert testimony, it cannot be inferred that Defendant Troche shot at the back of Pakman's vehicle after it had passed him based solely on Mr. McLeod observing Defendant Troche *not* shooting at the vehicle as it drove down the street. In short, Mr. McLeod's testimony is not evidence that Defendant Troche shot at Pakman's vehicle after it passed him, and thus does not create a genuine dispute of material fact.

Additionally, Plaintiff points to alleged discrepancies in the testimony in another attack on the eyewitness testimony. For example, Plaintiff argues that Defendant Troche testified that the car veered towards the passenger side, but that Sergeant Krimm did not see a discernible swerve on the video footage. (Plf.'s Troche Dep. at 93:7-10; Plf.'s Krimm Dep. at 18:17-21, 21:11-16.) First, the poor quality of the video made it difficult to determine whether the vehicle swerved. Sergeant Krimm's failure to recall a discernable swerve does not create a conflict with the other testimony.[2] Moreover, even if the car did not swerve, Plaintiff provides no evidence to contradict Defendants' evidence that the vehicle was aimed directly at the passenger side of the police vehicle, where both Defendant Troche and Mr. McLeod were positioned. Indeed, Crime scene tech Sergeant Corsolini testified that Pakman's vehicle was going straight toward the passenger side of the patrol car.

Plaintiff also disputes what caused Mr. McLeod to be pushed into the vehicle. Mr. McLeod testified that it was Pakman's vehicle making contact against the door that pushed him

---

[2] Sergeant Krimm also testified that he had not seen the video since 2013, and thus did not recall any discernible swerve. (Plf.'s Krimm Dep. at 21:11-14.)

into the patrol vehicle. (McLeod Prelim. Hearing Test. at 16:4-7; McLeod Interview at 71:12-25.) Mr. McLeod also heard metal scraping metal against metal. (McLeod Prelim. Hearing Test. at 16:10-15.) Sergeant Corsolini did not, however, find paint chips from Pakman's vehicle on the patrol vehicle, but did find white paint on Pakman's vehicle. (Plf.'s Corsolini Dep. at 56:3-5; Reply Corsolini Dep. at 72:17-19, 74:15-75:2.) Based on this, Plaintiff argues that the lack of paint chips means the car was not hit. Again, however, Plaintiff fails to produce any evidence, such as expert testimony, that paint from Pakman's vehicle should have been found on the patrol vehicle if the cars made contact. This is particularly significant when, as Defendants noted at oral argument, Pakman's vehicle had a bumper that was not painted. (*See also* Dkt. No. 116.) Thus, Plaintiff fails to affirmatively provide evidence that would create a dispute of material fact as to whether Pakman's vehicle hit the patrol vehicle. In short, in the absence of admissible evidence, Plaintiff's asserted discrepancies in the testimony are insufficient to defeat summary judgment.

### ii.    Firing at a Slow-Moving Vehicle

At the hearing, Plaintiff, for the first time, raised the possibility that Pakman's vehicle was driving between 2-7 mph when Defendant Troche fired at the vehicle. Plaintiff argued that in such circumstance, it was unreasonable for Defendant Troche to shoot at the vehicle, particularly without giving a warning that he would shoot.

Plaintiff, however, provides no evidence from which a fact-finder could conclude that the vehicle was driving at such a speed, and oral argument is not evidence. Plaintiff relies heavily on *Gonzalez v. City of Anaheim*, in which the Ninth Circuit found that a jury could find that the vehicle was only going 3-7 mph based on the defendants' own testimony. 747 F.3d 789, 795-96 (9th Cir. 2014). Specifically, the officers testified that the vehicle had moved 50 feet in five to ten seconds, and that it was going 50 mph when one of the officers shot. *Id.* at 794. The Ninth Circuit explained that the combination of these three facts was physically impossible; it pointed to the plaintiffs' arguments that if the vehicle had traveled 50 feet in ten seconds, the average speed would be 3.4 mph. *Id.* Likewise, if the vehicle had traveled 50 feet in five seconds, the average speed would be 6.8 mph. Thus, if a jury believed the officers' testimony that the vehicle had moved 50 feet in five to ten seconds, then the vehicle would only have been going at between 3-7

mph, a speed at which the defendants did not argue a threat would still be posed. *Id.* at 795-96.

Here, however, Plaintiff has not produced evidence to conclude that the vehicle was driving at only 2-7 mph. Plaintiff states that the parking lot was "small," but does not provide a measurement, nor compare that with the time it might have taken for Pakman to drive out of the parking lot -- which, as discussed above, would be a maximum of twelve seconds. Plaintiff does not provide expert testimony that opines as to the speed Pakman was driving. Furthermore, the evidence that Defendant Troche heard Pakman's car's tires screeching suggests that Pakman had floored the gas, suggesting he was not going 2-7 mph. (Plf.'s Troche Dep. at 91:16-20.) In short, there is nothing from which a fact-finder could infer that the vehicle was driving at only 2-7 mph, and, therefore, no support for Plaintiff's theory that the car was moving so slowly that Defendant Troche and Mr. McLeod were not in danger, or that Defendant Troche had sufficient time to give a warning that he would shoot.

Plaintiff also relies on the failure to test whether asphalt came from the gouge marks. The failure to test the asphalt is merely an attempt to create a genuine dispute of material fact from the absence of evidence. This is insufficient to defeat summary judgment, as Plaintiff must *produce* evidence to show a genuine dispute exists. *See Bhan*, 929 F.2d at 1409 (finding that the non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists").

Accordingly, the Court finds that Plaintiff has failed to produce admissible evidence to conclude that Pakman's vehicle was moving so slowly that it did not pose a threat. Thus, Plaintiff cannot establish that Defendant Troche's actions were unreasonable, or that the vehicle was moving slowly enough for Defendant Troche to issue a warning that he would shoot. Further, to the extent Plaintiff argues that Defendant Troche should have given a warning regardless of the speed at which the vehicle was moving, Plaintiff provides no authority which suggests that an officer must issue a warning even if a vehicle is coming at them at a high speed.[3]

---

[3] To the extent Plaintiff relies on *Gonzalez*, again, there the Ninth Circuit found that the vehicle may have been moving at 3-7 mph, and thus a jury could find that a warning was practicable. 747 F.3d at 797. In so finding, however, the Ninth Circuit emphasized that "[t]he absence of a warning does not necessarily mean that [the] use of deadly force was unreasonable." *Id.* At the hearing,

### iii. Firing at Vehicle Without Identifying Self and While Blinded by Headlights

At the hearing, Plaintiff argued briefly that Defendant Troche acted unreasonably because he never identified himself, and then shot at Pakman's vehicle while blinded by Pakman's headlights. Even assuming these facts as true, however, the Court finds that these facts alone do not demonstrate that Defendant Troche acted unreasonably, and Plaintiff does not explain otherwise.

Analyzing the *Graham* factors, the Court finds that the underlying crime was not severe, as Defendant Troche believed Pakman was a drunk driver, and saw Pakman commit traffic violations such as going through a stop sign. (Defs.' Troche Dep. at 38:5-14, Plf.'s Troche Dep. at 46:11-16.) At the time of the shooting, however, the evidence in the record shows that Pakman was attempting to escape the scene by driving toward the passenger side of the police vehicle, where both Defendant Troche and Mr. McLeod were located. Even if Pakman's intent was simply to escape, and not to hit Defendant Troche and Mr. McLeod, as Plaintiff argues, Plaintiff does not dispute that Pakman was driving in their direction. By driving towards them, the threat to Defendant Troche and Mr. McLeod was extremely high, which is evidenced by Mr. McLeod being knocked over when Pakman's vehicle hit the passenger door of the police car. Further, Pakman was attempting to escape the scene, although he may not have known that Defendant Troche was an officer. Moreover, from the time it took for Defendant Troche to report that Pakman was driving at him to reporting that shots were fired, only twelve seconds had passed, suggests a fast-developing situation. Under these circumstances, "[a] reasonable police officer confronting this scene could reasonably believe that the [vehicle] posed a deadly threat" to Mr. McLeod and himself. *Wilkinson v. Torres*, 610 F.3d 546, 553 (9th Cir. 2010).

Therefore, the Court concludes that based on the evidence in the record, the amount of force used by Defendant Troche was reasonable. Defendant Troche is therefore entitled to summary judgment on this claim.

---

Plaintiff did not argue that Defendant Troche should give a warning regardless; instead, Plaintiff only argued that because Pakman was probably going between 2-7 mph, it was reasonable to give a warning.

### C.    Qualified Immunity

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S.Ct. 548, 551 (2017) (internal quotation omitted). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotations omitted). In particular, "[u]se of excessive force is an area of law in which the results depend very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 138 S.Ct. 1148, 1153 (2018). The Supreme Court has further emphasized that "qualified immunity is effectively lost if a case is erroneously permitted to go to trial." *White*, 137 S.Ct. at 551 (internal quotation omitted).

In determining if qualified immunity exists, the Court must generally first determine whether the facts make out a violation of a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Next, the Court determines if "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* In *Pearson*, however, the Supreme Court found that this two-step sequence was not mandatory (although beneficial), and that some cases could be decided by going directly to the second step. *Id.* at 236.

As discussed above, Plaintiff has failed to establish a violation of a constitutional right. Even if Plaintiff had done so, the Court finds that Defendant Troche would still be entitled to qualified immunity because Plaintiff has not shown that the right at issue was clearly established at the time of the alleged misconduct. The Supreme Court has overturned the appellate court's rejection of qualified immunity because "[i]t failed to identify a case where an officer acting under similar circumstances as [the defendant officer] was held to have violated the Fourth Amendment." 137 S.Ct. at 552. Moreover, "general statements of the law are not inherently incapable of giving fair and clear warning to officers . . . the general rules set forth in *Garner* and *Graham* do not by themselves create clearly established law outside an obvious case." *Kisela*, 138 S.Ct. at 1153 (internal quotations omitted).

Here, instead of pointing to any authority with similar facts that would have clearly

established the right at issue, Plaintiff only argues that the credibility issues preclude a finding of qualified immunity. The Court disagrees; simply attacking a party's or witness's credibility does not create a genuine issue of material fact when Plaintiff has failed to produce evidence that would support his theories. Based on the facts in the record, the Court finds that there is no clearly established constitutional or statutory right that was violated. Plaintiff points to no authority with similar circumstances which would have provided an officer in Defendant Troche's situation notice that his actions were a violation of a constitutional right. The closest such case is *Gonzalez*; again, however, that case involved a situation where the jury could have found that the decedent's vehicle was moving at 3-7 mph and that a warning should have been given, whereas here Plaintiff has produced no evidence to allow a fact-finder to draw a similar conclusion.[4] The Court, therefore, concludes that Defendant Troche is entitled to qualified immunity.

### D. *Monell* Liability

Next, the Court concludes that Plaintiff has failed to establish *Monell* liability against the City. In general, local governments are "persons" subject to liability under 42 U.S.C. § 1983 where official policy or custom causes a constitutional tort, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); however, a city or county may not be held vicariously liable for the unconstitutional acts of its employees under the theory of respondeat superior. *See Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997); *Monell*, 436 U.S. at 691; *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995). Thus, to impose municipal liability under § 1983 for a violation of constitutional rights, a plaintiff must show: (1) that the plaintiff possessed a constitutional right of which he or she was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy is the moving force behind the constitutional violation. *See Plumeau v. Sch. Dist. #40 Cty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997).

Here, Plaintiff argues that Defendant's practice of allowing ride alongs to accompany patrol officers without proper training, supervision, and management proximately caused

---

[4] Indeed, the evidence in the record shows that Defendant Troche yelled at Pakman to turn the car off before opening fire. (McLeod Prelim. Hearing Test. at 15:9-11.)

1    Decedent's death.  (Plf.'s Opp'n at 30-31.)  Plaintiff, however, provides no explanation for how this

2    alleged practice caused Decedent's death.  Plaintiff, for example, argues that Mr. McLeod was

3    permitted to ride along with Defendant Troche without preparing the appropriate documents and

4    without receiving instructions on where to stand during car stops, but fails to explain how either of

5    those facts, if different, would have affected what occurred.  Similarly, Plaintiff points to the

6    failure to adequately instruct patrol officers as to how to monitor and control their ride along

7    passengers, but again fails to analyze how this failure proximately caused Decedent's death.

8        In the alternative, Plaintiff points to Defendant "Troche's act of firing at the car as it sped

9    away from the scene" as indicating a severe lapse in training, but again, there is no evidence that

10   would permit a fact-finder to conclude that Defendant Troche fired at Pakman's vehicle after it had

11   passed him.  Accordingly, summary judgment on the *Monell* claim is appropriate.

12       **E.    State Claims for Assault, Battery, and Negligence**

13       "The California Court of Appeal has held that a determination that an officer's use of

14   deadly force is objectively reasonable under § 1983 precludes negligence, assault, and battery

15   claims."  *Watkins v. City of San Jose*, Case No. 15-cv-5786-LHK, 2017 WL 1739159, at *20

16   (N.D. Cal. May 4, 2017); *see also Brown v. Ransweiler*, 171 Cal. App. 4th 516, 533 (2009) ("We

17   further conclude that because Ransweiler's use of force against Ojeda was reasonable, Ransweiler

18   may not be held liable . . . for battery for any injury that may have resulted from that same use of

19   force."); *id.* at 534 ("As we have already concluded in analyzing the . . . battery claim,

20   Ransweiler's decision to use deadly force and his use of deadly force were objectively reasonable

21   under the circumstances.  As a result, Ransweiler met his duty to use reasonable care in deciding

22   to use and in fact using deadly force, and, as a matter of law, cannot be found to have been

23   negligent in this regard.").  Here, the Court has concluded that Defendant Troche's use of deadly

24   force was objectively reasonable under § 1983.  Therefore, Defendants are entitled to summary

25   judgment on the negligence, assault, and battery claims.

26   ///

27   ///

28   ///

# IV. CONCLUSION

For the reasons stated above, the Court GRANTS Defendants' motion for summary judgment.

IT IS SO ORDERED.

Dated: June 28, 2018

_____

KANDIS A. WESTMORE
United States Magistrate Judge